UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

DONNA CAMP,                          )
                                     )
              Plaintiff,             )      Case No. 08 C 4020
       v.                            )
                                     )      Judge Joan B. Gottschall
CENTRUE FINANCIAL CORP.,             )
and CENTRUE BANK,                    )
                                     )
              Defendants.            )

## MEMORANDUM OPINION & ORDER

Plaintiff Donna Camp's Second Amended Complaint (the "Complaint") alleges that Defendants Centrue Financial Corp. ("Centrue Financial") and Centrue Bank ("Centrue") (collectively, "Defendants") unlawfully terminated Camp's employment in retaliation for her request for a leave of absence pursuant to the Family and Medical Leave Act of 1993 ("FMLA"), 29 U.S.C. § 2601, *et seq.* Defendants now move for summary judgment in two separate motions. Camp, for her part, opposes only Centrue's motion and, additionally, has moved for leave to amend the Complaint to add a claim for unlawful interference with her exercise of her right to take leave for medical reasons under the FMLA.

## I. BACKGROUND[1]

---

[1] The facts in this opinion and order are derived from the parties' statements of facts filed pursuant to Local Rule 56.1. Unless indicated, the facts are undisputed. At the summary judgment stage, the court is only to consider facts that are supported by evidence that would be admissible at trial. *Scott v. Edinburg*, 346 F.3d 752, 759–60 & n.7 (7th Cir. 2003). To the extent that facts are considered herein they are deemed to be admissible unless indicated to the contrary in the Analysis section.

Centrue asks the court to strike and deem admitted Plaintiff's responses to Defendants' Statement of Material Facts ("Defs.' Stmt.") 23, 26, 27, 28, 29, 31, 32, 40, 41, 42, 44, 50, 51, 59, 62, 64, 71, and 72 for failure to conform with Local Rule 56.1, which, *inter alia*, requires that any disagreement contained in such responses specifically reference "affidavits, parts of the record or other supporting materials relied upon." L.R. 56.1(b)(3)(B).

Beginning in 2006 Donna Camp worked as a Mortgage Loan Originator ("MLO") for Centrue Bank at Centrue's Yorkville, Illinois branch. As an MLO Camp was responsible for, among other things, obtaining and initiating residential mortgage loans, developing working relationships with realtors and others in the real estate industry, inputting mortgage loans, and assisting borrowers, but she did not have authority to lend money or underwrite loans. Centrue employees originate, approve and close home equity lines of credit ("HELOCs") through a computerized loan scoring and lending program called Mark IV. Centrue should have eliminated Camp's access to the Mark IV program when she became an MLO, but did not. Dan Sabol, a Vice President/Regional Mortgage Sales Manager, supervised Camp. Executive Vice President Roger Dotson supervised Sabol.

In fall 2007, a consultant was working with Dotson and other senior officers at Centrue to certify Centrue's compliance with the Sarbanes-Oxley Act of 2002, Public Law No. 107-204. Part of the Sarbanes-Oxley team's mandate was to segregate duties to

---

The court has reviewed Plaintiff's Response to Defendants' Combined Statement of Material Facts and it is deficient in a number of respects, including Camp's failure to file a statement "containing numbered paragraphs, each corresponding to and stating a concise summary of the paragraph to which it is directed." L.R. 56.1(b)(3)(A). Instead of abiding by this requirement, Camp filed a numbered list without "a concise summary of" Defendants' statements. This failure has forced the court to look back and forth between Defendants' statement of facts and Camp's responses in order to evaluate the validity of each—no small inconvenience. While the court declines to exercise its discretion to strike Camp's response on this basis, as Defendants' request, it admonishes counsel to follow the local rules.

The court sustains Defendants' other objections to Camp's Response to Defendants' Combined Statements of Material Fact, which were directed at paragraphs numbered 23, 26, 27, 28, 29, 31, 32, 40, 41, 42, 44, 50, 51, 59, 64, for failing to specifically reference "affidavits, parts of the record or other supporting materials relied upon," L.R. 56.1(b)(3)(B), in disputing the relevant statement, and deems these facts admitted. The court strikes paragraphs numbered 71 and 72 for failing to admit or deny those facts and also deems those facts admitted. *See McGuire v. United Parcel Serv.*, 152 F.3d 673, 674-75 (7th Cir. 1998) (deeming admitted a response to a statement of uncontested facts that neither admitted nor denied the fact, but stated that the respondant had insufficient knowledge to do so). Regarding Camp's response to paragraph 62: Camp purports to admit only part of this fact, but the testimony she cites in support of her disagreement does not contradict the remaining portion of the statement. This response is therefore stricken and the paragraph deemed admitted for violating Rule 56.1(b)(3)(B).

avoid situations which would invite fraud, such as allowing an employee to manage a complete transaction from beginning to end. Dotson believed that it violated Sarbanes-Oxley principles for MLOs to have access to Mark IV or use it to originate HELOCs, as such access might allow MLOs to unlawfully manipulate the mortgage lending process.

In November 2007, Dotson discovered that Camp continued to have access to Mark IV even though she was an MLO and should have had her access to Mark IV terminated when she began working in that position (Camp was formerly a personal banking supervisor). After investigating the issue, Dotson told Camp and Sabol, among others, that Camp was not to have access to Mark IV. On November 16, 2007, after Dotson had a discussion with Camp regarding why Camp could not have access to Mark IV, Camp sent Dotson an e-mail confirming that she understood that her access to Mark IV was being rescinded and stating that she would "focus on mortgages only" from that date forward. Defs.' Stmt., Tab A1, Ex. 8.

Camp continued to use Mark IV without Dotson's knowledge. Camp used the program to search for potential mortgage clients and inputted and closed HELOC loans; completing her last HELOC loan in the middle of February 2008. Dotson discovered Camp's continuing use of Mark IV on approximately February 20, 2008, upon finding Camp's name listed on a Mark IV access log. Dotson subsequently reviewed the Mark IV system and noted that Camp had logged on to Mark IV. Dotson further investigated Camp's acts by speaking with Sabol, Mark IV operations supervisors, and IT Department personnel. On February 22, 2008, during a meeting with the Bank's retail credit committee, Dotson confirmed that MLOs were not to have access to Mark IV.

Dotson determined that Camp's disobedience merited dismissal, advised Centrue's other executive board members of his conclusion, and discussed the issue with Heather Hammitt, Centrue's Director of Human Resources, both to confirm that Camp's disobedience could warrant dismissal and to review dismissal procedures. Dotson completed a disciplinary action form reflecting Camp's dismissal and forwarded the completed form to Hammitt for her review on the morning of February 25, 2008. Hammitt approved that form and Dotson made arrangements to discharge Camp the next day. Sabol sent an e-mail to Dotson on February 25, 2008 citing Camp's production figures, and asking Dotson to reconsider his decision to terminate Camp on that basis; Dotson declined to do so. Dotson called Camp on February 26, 2008, and left her a message indicating that he needed to see her at Centrue's Yorkville branch, where she worked. Later, Dotson spoke with Hammitt by phone at approximately 3:30 p.m. while driving to Yorkville. During the conversation, Hammitt and Dotson discussed Dotson's decision to discharge Camp, his denial of Sabol's reconsideration request, and procedures for dismissal. Hammitt then informed Dotson that she had just learned that Camp submitted a request for FMLA leave the day before. Dotson testified that this conversation, while *en route* to Yorkville to fire Camp, was the first time he heard of Camp's FMLA leave request.

Donna Mussatto, a benefits specialist at Centrue, processes FMLA leave requests and assists employees with those requests. Camp discussed a potential FMLA leave request with Mussatto on or about February 8, 2008. Mussatto sent leave request forms to Camp by first-class mail on February 11, 2008, and by e-mail on February 19, 2008. Camp submitted her written FMLA leave request to Mussatto on the morning of February

25, 2008. Mussatto mailed notice of her eligibility for FMLA leave to Camp the same day. Mussatto testified that she discussed Camp's FMLA request only with Hammitt.

Dotson discharged Camp on the early evening of February 26, 2008. FMLA leave was not discussed. At the discharge meeting Camp did not deny that she accessed and closed loans in Mark IV after Dotson prohibited her doing so in November 2007.

Camp was never employed by Centrue Financial Corporation.

## II. LEGAL STANDARD

Summary judgment is warranted where "the pleadings, the discovery, and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c)(2); *Brengettcy v. Horton*, 423 F.3d 674, 680 (7th Cir. 2005). All facts, and any inferences to be drawn from them, must be viewed in the light most favorable to the non-moving party. *Wis. Cent., Ltd. v. Shannon*, 539 F.3d 751, 756 (7th Cir. 2008). Normal burdens of proof remain, however. If a plaintiff has failed to establish one of the elements of his case and there is no factual dispute regarding that element, then summary judgment will be entered in favor of the defendant. *See Beard v. Banks*, 548 U.S. 521, 529-30 (2006); *see also Johnson v. ExxonMobil Corp.*, 426 F.3d 887, 892 (7th Cir. 2005) ("Summary judgment for a defendant is appropriate when a plaintiff fails to make a sufficient showing to establish the existence of an element essential to [his] case on which she will bear the burden of proof at trial.") (quoting *Cleveland v. Policy Mgmt. Sys. Corp.*, 526 U.S. 795, 805-06 (1999) (citations and alterations omitted)). In the context of employment discrimination cases, the court must analyze an employer's assertions "with 'added rigor' before granting summary judgment." *Mills v. Health Care*

*Serv. Corp.*, 171 F.3d 450, 455 (7th Cir. 1999) (quoting *Sarsha v. Sears, Roebuck & Co.*, 3 F.3d 1035, 1038 (7th Cir. 1993)).

## III. ANALYSIS

Camp contends that she was dismissed from her position in retaliation for requesting leave pursuant to the FMLA; she can prevail on her claim under either the direct or indirect method of proof. *Humphries v. CBOCS West, Inc.*, 474 F.3d 387, 404 (7th Cir. 2007). Under the direct method, Camp must show that (1) she engaged in a statutorily protected activity; (2) she suffered a materially adverse action by her employer; and (3) a causal connection exists between the two. *Argyropoulos v City of Anton*, 539 F.3d 724, 733; *Humphries*, 474 F.3d at 404. The indirect method retains these first two elements, but replaces the requirement of direct causal link, allowing a plaintiff to create a presumption of retaliation by showing that she was performing her job satisfactorily and that she was treated less favorably than a similarly situated employee who did not request FMLA leave. *Argyropoulos*, 539 F.3d at 733. If Camp establishes a prima facie case under the indirect method, Centrue then must articulate a nondiscriminatory reason for her termination; if it does, Camp must then demonstrate that Centrue's rationale is a pretext for retaliation. *Nichols v. S. Ill. Univ.-Edwardsville*, 510 F.3d 772, 785 (7th Cir. 2007).

### A. Direct Method

Camp and Centrue agree that Camp engaged in statutorily protected activity by requesting FMLA leave and that she suffered an adverse employment action when Centrue dismissed her from her position; the parties dispute whether there is sufficient evidence to create a genuine issue of material fact regarding the causal connection

between the two. Direct evidence of such a link is rare, as it requires "an actor's admission of discriminatory animus," *Stephens*, 369 F.3d at 787 (citing *Nagle v. Vill. of Calumet Park*, 554 F.3d 1106, 1114 (7th Cir. 2009)); therefore, Camp may establish causation under the direct method "by creating a convincing mosaic of circumstantial evidence that allows a jury to infer intentional discrimination by the decisionmaker." *Phelan v. Cook County*, 463 F.3d 773, 779-80 (7th Cir. 2006).

Camp contends that summary judgment on her retaliation claim should be denied because circumstantial evidence exists from which a jury could infer that there is a casual connection between her dismissal and her FMLA request. Camp pieces her mosaic together from evidence that (1) Camp notified Centrue of her intent to take FMLA leave prior to her dismissal, (2) Dotson knew of her FMLA request prior to his decision to terminate Camp, (3) other employees who engaged in similar conduct were treated less harshly, and (4) evidence exists to show that her dismissal was pretextual.[2] Centrue argues that summary judgment in its favor is appropriate because Camp's evidence is insufficient to establish a genuine factual dispute regarding the legitimate, *i.e.*, non-retaliatory, cause for her dismissal.

### 1. Suspicious Timing

Centrue argues that the court could grant its motion for summary judgment based solely on the lack of evidence to contradict Dotson's testimony that he learned of Camp's request for FMLA leave on February 26, 2008 at approximately 3:30 p.m. while *en route*

---

[2] These are the types of evidence from which Camp may construct a mosaic of circumstantial evidence under the direct method. *See Hasan v. Foley & Lardner LLP* 552 F.3d 520, 530 (7th Cir. 2008).

to discharge Camp.[3]  Absent knowledge of Camp's protected conduct prior to Dotson's decision to terminate Camp's employment, Centrue submits that a jury could not find Dotson's dismissal of Camp retaliatory.  *See Rogers v. City of Chi.*, 320 F.3d 748, 754 (7th Cir. 2003) ("A plaintiff must provide direct or circumstantial evidence that the *decisionmaker* has acted for a prohibited reason.") (emphasis in original).  Camp urges in opposition that (a) Sabol, her supervisor, and Mussatto, an employee in human resources, were aware of her need to take a medical leave weeks before her dismissal, and evidence exits from which the jury could infer that Dotson knew of Camp's FMLA request before February 26th, and (b) the evidence is equivocal as to when Dotson made the decision to terminate Camp.  The court takes these arguments in turn.

### a.  When did Dotson learn of Camp's FMLA request?

Camp informed Donna Mussatto of her need to take FMLA leave on February 8, 2008.  Before that date, Camp had also informed her supervisor, Dan Sabol, of her need to take leave for cancer treatment (Sabol advised Camp to contact Mussatto).  Camp also testified that she told Michelle Null, a bank branch manager, along with other Centrue employees (whose names Camp could not recall), about her need to take a medical leave.

From this evidence Camp asserts that the timing of her dismissal was suspicious because Centrue was on notice of Camp's FMLA request at least twenty days prior to her termination on February 26, 2008.  But whether Centrue as an entity was on notice of Camp's FMLA leave request is not determinative.  The relevant question is whether there is evidence from which a jury could infer that Dotson, the undisputed decisionmaker, learned of Camp's FMLA request prior to the date on which he made his decision to

---

[3]      The day before Dotson had told Sabol that he would be dismissing Camp and had forwarded a disciplinary action form to Hammitt for approval.

terminate Camp.  *See Rogers*, 320 F.3d at 754.  In that regard, Camp submits that Dotson knew of Camp's FMLA request before he spoke with Hammitt at 3:30 on February 26th because Dotson testified that during that 3:30 p.m. call, after Hammitt asked Dotson if he "still felt comfortable," Dotson Dep. 162 lns. 23-24, with his decision to fire Camp, Hammitt then asked, "so you have made up your mind?  There is no exposure to the bank?"  *Id*. at 163 lns. 12-13.  Camp claims that Hammitt's question regarding exposure "implies knowledge of facts from which 'exposure' could potentially arise."  Resp. 6.  In the next few lines of Dotson's testimony, however, he states: "then [Hammitt] told me, well . . . I [(Hammitt)] just found out [Camp] applied for an FMLA leave . . . would that change your mind?"  *Id*. at 163 lns. 15-18.  While it is uncertain what Hammitt meant by "exposure," Dotson's unrebutted testimony indicates that Hammitt told Dotson during their call that she just learned of Hammitt's FMLA leave request, and Dotson testified that he did not know of the request until Hammitt told him about it during their conversation.   Accordingly, Hammitt's mention of "exposure" cannot support an inference that Dotson knew of Camp's FMLA request before Hammitt informed him of it.  While the court cannot know what Hammitt meant by exposure, her use of this word does not prove that Dotson had prior knowledge of Camp's FMLA request—which Camp must show to create a genuine issue of fact at summary judgment.  *See Argyropoulos*, 539 F.3d at 732.[4]  Even if one assumes that Hammitt was referring to FMLA exposure,

---

[4]       It bears repeating that Camp has admitted that she formally requested FMLA leave by submitting forms to Mussatto on February 25th, and has also admitted that Dotson and Hammitt previously discussed whether there were grounds to terminate her for violating Dotson's order not to use Mark IV.  *See* Defs.' Stmt. 44 (citing Dotson Dep. 127 lns. 4-10).  Hammitt's question regarding exposure is consistent with the discussions Hammitt and Dotson had in the days leading up to Camp's dismissal.

which is far from clear, her statement is hardly evidence that Dotson already knew what Hammitt was about to tell him.

Camp's other evidence is similarly conjectural. Camp lays out two deductive steps a jury could take to infer that Dotson learned of Camp's FMLA request prior to February 26: Mussatto told Hammitt about Camp's FMLA request at some unspecified time,[5] and Hammitt had a number of conversations with Dotson regarding Camp's insubordination; from this, Camp argues, a jury could infer that Dotson knew of Camp's FMLA request before February 26th.[6] But as the testimony discussed in the above paragraph reveals, Dotson testified that Hammitt told him at 3:30 p.m. on the 26th that Hammitt had just found out about Camp's FMLA request. Moreover, Camp has admitted that she sent Mussatto her leave request on February 25th, a fact consistent with Hammitt's recently being informed of that request. Accordingly, the conjectural evidence that Camp puts forward (that Hammitt previously told Dotson of Camp's request) breaks down because Camp has not rebutted Dotson's testimony – which is consistent with facts admitted by Camp – that Hammitt had just learned of the request when she spoke to Dotson at or about 3:30 p.m. on February 26th.

Finally, Camp urges that a jury could infer that Dotson learned of Camp's FMLA request prior to February 26th from "his dismissive response to Sabol," Resp. 5, when Sabol told Dotson that Camp was out of her Yorkville office because she was "at a doctor's appointment having a chemo treatment," Sabol Dep. 67, lns. 18-20, on February

---

[5] The only evidence that Mussatto discussed Camp's FMLA leave with Hammitt comes from an affidavit Mussatto signed that was included as an exhibit to Centrue's statement of material facts. The affidavit does not specify when Mussatto discussed Camp's leave request with Hammitt.

[6] Camp states in her response that Dotson and Hammitt had "'numerous discussions' regarding Camp," Resp. 5, but provides no citation for this quotation.

26th while Dotson was *en route* to Yorkville to dismiss her. Sabol testified that Dotson's response to this news was "I don't really care where she is at. I am going to be up there [in Yorkville]. She is going to be fired." *Id*. at lns. 23-24. From this reaction Camp asserts that a jury could find that Dotson's "lack of inquiry or request for further details," Resp. 5, about Camp's chemotherapy means Dotson already knew about Camp's leave request. Camp's theory as to the intention behind Dotson's remark is wholly speculative and is insufficient to satisfy her burden in opposing summary judgment. At best, Dotson's statement reflects a fixed determination to discharge Camp for the reasons he had set forth the day prior in the dismissal notice that he sent to Hammitt for her review; Camp points to no evidence that could support a different interpretation of Dotson's reaction.

The court notes, however, that Dotson denies that Sabol mentioned Camp's cancer treatment during their conversation. While resolution of this contradictory testimony turns on an assessment of credibility that is the province of the jury, a finding in Camp's favor on this issue would not constitute a material factual dispute because all Sabol's testimony establishes is that he told Dotson about Camp's medical condition while Dotson was driving to Yorkville to fire Camp on February 26th. As discussed in Section III.1.b. *infra*, Dotson had made the decision to terminate Camp prior to his conversation with Sabol on February 26th. Even if a jury concluded that Dotson learned of Camp's cancer during his discussion with Sabol, that evidence would not support a finding of retaliatory intent. Sabol's testimony, if credited, would support only an inference that Dotson rejected reconsideration of a decision he had already made.

While the court is aware of the difficulty of proving a retaliation case, Sabol's statement regarding Camp's chemotherapy treatment is the only evidence Camp offers to rebut Dotson's testimony that he first learned of Camp's FMLA request when he spoke to Hammitt at 3:30 p.m. on February 26th, when Hammitt told him that Mussatto had "just" informed her of Camp's FMLA request, a statement that is at least consistent with Camp's admission that she submitted her form to Mussatto on February 25th. *See* Dotson Dep. 163 lns. 16-17. While a jury could disbelieve Dotson's testimony at trial, and believe Sabol, it would still have no evidence from which it could reach the conclusion that Dotson knew of the FMLA request prior to his drive to Yorkville to terminate Camp.[7]

Accordingly, Camp has failed to offer evidence that Dotson knew of her request for leave before his trip to Yorkville to discharge Camp.

### b. When did Dotson decide to terminate Camp?

Undisputed evidence establishes that Camp's termination was the final event in a decisionmaking process that Dotson put into motion as soon as he discovered, on February 20, 2008, that Camp had been accessing Mark IV in violation of his order of November 2007 that she not do so. That process involved, over the course of a few days, further investigation of Camp's insubordination, discussions with Sabol, Centrue's President and CEO Tom Daiber, Hammitt, and Centrue's executive committee.[8] In section III.B.1.a above the court determined that Camp has failed to show that any

---

[7]     *See Bankers Life & Cas. Co. v. Guar. Reserve Life Ins. Co. of Hammond*, 365 F.2d 28, 34 (7th Cir. 1966) (disbelief cannot support an affirmative finding that the reverse of a witness's testimony is true) (citing *Moore v. Chesapeake & O. Ry.*, 340 U.S. 573, 576 (1951); *Eckenrode v. Pennsylvania R.R.*, 164 F.2d 996, 999 (3d Cir. 1947)).

[8]     Though Dotson discussed Camp's insubordination with a number of his superiors, there is no dispute that Dotson alone made the decision to terminate Camp's employment.

competent evidence exists from which a jury could infer that Dotson knew of Camp's FMLA request prior to his drive to Yorkville to fire her. Not only is it undisputed that Dotson was on his way to dismiss Camp when he learned of her FMLA request, but it is undisputed that he had taken a number of other steps – speaking with Sabol and Hammitt, submitting a disciplinary action form for Hammitt's review, setting up an appointment with Camp in Yorkville – which show that Dotson intended to discharge Camp before he learned of her protected conduct.

Nevertheless, Camp attempts to establish that Dotson made the final decision to terminate her employment only after receiving notice of her FMLA request at or about 3:30 p.m. on February 26th.[9] Besides Dotson's unambiguous statement to Sabol, the only evidence Camp points to in support of her position is the conversation Dotson had with Hammitt at 3:30 p.m. on February 26 (while Dotson was on his way to Yorkville to discharge Camp), during which Hammitt informed Dotson of Camp's FMLA request. Camp seizes on Dotson's testimony that during that conversation Hammitt asked him, "[s]o you have made up your mind?," Dotson Dep. 163 ln. 12, to argue that Dotson had not decided to terminate Camp's employment until he and Hammitt had that conversation at 3:30 p.m. This contention is untenable. Immediately before Hammitt asked Dotson if he had made up his mind, Hammitt asked if Dotson "still felt comfortable with the

---

[9]     In her response Camp makes an issue of the precise date on when Dotson "decided" to dismiss Camp, and it does appear from the evidence that there was no definitive and irrevocable "date of decision," (apart from the meeting where Camp was discharged) but rather a series of acts which led to Camp's ultimate termination. Whether Dotson "decided" to dismiss Camp on the 24th, 25th or 26th of February is of no moment because the relevant inquiry in a retaliation action has to do with sequence: did Dotson decide to terminate Camp before or after he learned of her protected activity? The timing can be suspicious only if the "decision" came after Dotson learned of Camp's FMLA request. As the court has concluded that Camp has failed to put forth any competent evidence that Dotson learned of Camp's FMLA request prior to February 26, 2008, it will review only the evidence and argument with which Camp attempts to establish that Dotson made the decision to terminate Camp's employment after that time.

decision [Dotson] had made" and Dotson answered affirmatively. *Id.* at 162-63 lns. 23-1. Hammitt and Dotson then discussed the items Dotson had listed on the disciplinary action form, which indicated the reasons for Camp's discharge, and which Dotson had submitted to Hammitt for her review and approval on February 25. Nothing in this discussion suggests that Dotson made the decision to discharge Camp on February 26 while *en route* to do so. All of the evidence cited by Centrue shows that Dotson had decided to terminate Camp prior to learning of her leave request on February 26 at 3:30 p.m., while driving to meet Camp and discharge her.

At best the conversation between Hammitt and Dotson shows that Dotson did not decide to change course after learning of Camp's FMLA request. In the light most favorable to the non-moving party, the court will consider Hammitt and Dotson's conversation very weak evidence of suspicious timing and view the evidence in that light. While this evidence of suspicious timing can constitute only a *de minimis* part of Camp's mosaic of circumstantial evidence, the fact that Camp was terminated the day after she submitted her request for FMLA leave is also evidence of suspicious timing. Whether a triable issue remains regarding the cause of Camp's dismissal, however, hinges on Camp's other circumstantial evidence, to which the court now turns.[10]

### 2. Disparate Treatment of Similarly Situated Employees.

With respect to similarly situated individuals, Camp asserts that two Centrue employees who had not requested FMLA leave, Dan Sabol (Camp's supervisor) and Michelle Null (a bank branch manager), committed similar conduct, but were treated

---

[10]    Adducing other evidence would be particularly important in any case, as even strong evidence of suspicious timing "alone rarely is sufficient to create a triable issue." *Andonissamy v. Hewlett-Packard Co.*, 547 F.3d 841, 851 (7th Cir. 2008).

more leniently than Camp. These purported comparators, however, are not similarly situated to Camp; their treatment, therefore, is not circumstantial evidence of retaliation. Generally, similarly situated individuals must be "directly comparable in all material respects," *Sartor v. Spherion Corp.,* 388 F.3d 275, 279 (7th Cir.2004) (internal quotation omitted), a standard requiring Camp "to show not only that the [comparable] employees reported to the same supervisor, engaged in the same conduct, and had the same qualifications, but also to show that there were no 'differentiating or mitigating circumstances as would distinguish . . . the employer's treatment of them.'" *Ineichen v. Ameritech*, 410 F.3d 956, 960 (7th Cir. 2005) (quoting *Radue v. Kimberly-Clark Corp.,* 219 F.3d 612, 617-18 (7th Cir. 2000)). Neither of Camp's comparators occupied the same position as Camp (Mortgage Loan Originator), reported to the same supervisor or engaged in the same conduct.

Sabol was Centrue's Vice President/Regional Mortgage Sales Manager, reported to Dotson, and supervised *Camp*. Null was the manager of Centrue's Yorkville bank branch, and Camp does not specify who supervised her. As for these purported comparators' wrongful conduct, Camp asserts that Sabol failed to ensure that Camp did not access Mark IV per Dotson's order and Null gave Camp permission to access Mark IV, but neither of them were punished for their conduct. Such acts, however, even if true, are not comparable to Camp's breach over many months of a direct order from Dotson not to use Mark IV. Camp has failed to present evidence that similarly situated Centrue employees who did not engage in protected conduct were treated more leniently than Camp was.

### 3. Evidence that Dotson's Reason For Dismissing Camp Was a Pretext.

Centrue submits that Camp's disobedience of Dotson's order not to use Mark IV for any purpose, and particularly to close HELOC loans, means that she was not meeting legitimate business expectations and therefore cannot show that her discharge was a pretext for retaliation. Camp contends to the contrary that (1) her performance met or exceeded Centrue's expectations, (2) Sabol, Camp's direct supervisor, believed that there was nothing wrong with Camp's use of the Mark IV program, (3) Dotson was unable to identify how Camp's accessing Mark IV violated Sarbanes-Oxley, (4) Dotson, after indicating that he had reviewed Camp's February 8, 2008 performance review, which disclosed that she had closed 23 HELOC loans in 2007, did not issue Camp a warning, (5) Camp's February 8, 2008 performance review stated that Camp should make it a goal to cross-sell HELOC loans, (6) Sabol told Camp that she could continue to access Mark IV, and, finally, (7) Sabol believed that Camp was a valuable employee and that terminating her was a harsh penalty.

That Camp's performance was generally excellent is not very probative here, as Camp admits that she understood Dotson's order not to use Mark IV and disregarded it; Camp cites no evidence showing that such insubordination was not viewed by Dotson as constituting good cause for her dismissal.

Sabol's opinion that he did not believe Dotson's direct order to Camp was grounded in a valid rationale is equally immaterial. Dotson was Sabol's superior, and Dotson was charged with implementing procedures to weed out sources of potential fraud to ensure Centrue's compliance with Sarbanes-Oxley. Dotson believed that Camp's use of Mark IV could be a source of potential fraud and forbade Camp from using it in

November 2007 when he found out that she had access. That Sabol disagreed with his superior's opinion about the potential for fraud in Camp's use of Mark IV, does not constitute evidence that Dotson's discharge of Camp was pretextual because (1) there is no foundation to establish that Sabol's opinion regarding Sarbanes-Oxley compliance had any relationship to his duties at Centrue or to his expertise, and (2) it is undisputed that implementing such compliance measures was Dotson's responsibility.

The absence of a written statement prohibiting mortgage loan originators like Camp from accessing Mark IV or closing HELOC loans is as irrelevant as Dotson's inability to name anyone else at Centrue who believed Camp's access to Mark IV violated Sarbanes-Oxley. It was Dotson's responsibility to locate potential problems with fraud in order to certify Centrue's Sarbanes-Oxley compliance and he believed Camp's access created a problem for Centrue. Whether Dotson was ultimately correct in this assessment does not undo Camp's breach of Dotson's command, and Camp provides no basis from which the court or a reasonable jury could determine that it would. Moreover, Camp has adduced no competent evidence to show that Dotson's belief was unfounded or not sincerely held.

Dotson's approval of Camp's performance review of January 8, 2008, which was written by Sabol and Camp and, *inter alia*, contained a comment written by Camp that she had closed almost two million dollars in HELOC loans in the previous year (and wanted that fact considered in her evaluation), does not, as Camp asserts, show that Dotson approved of Camp's closing of HELOC loans. Camp's comments simply state that she had closed 23 HELOCs worth $1,849,016.20 and that she would like those loans to be taken into account in her performance review. *See* Def.'s 56.1 Stmt., Ex. 7. For his

part, Dotson checked a box stating that he had reviewed her evaluation.[11]  There is no evidence that he approved of Camp's acts, and it is not obvious why Dotson should have taken action against Camp based on these comments.  After all, Dotson told Camp not to use Mark IV and not to close HELOC loans in November of 2007; the vast majority of Camp's 2007 HELOC loans could easily have been closed before Dotson forbade her from doing so.  Camp has not presented evidence that she closed the HELOC loans in the four to six week period between Dotson's order and her review or that Dotson believed she did.  Camp's comment, then, would have only confirmed what Dotson already knew about Camp's past conduct: that she had been accessing Mark IV and closing HELOC loans.  Accordingly, that Dotson reviewed Camp's evaluation and approved it does not show that Dotson actually condoned her writing and closing HELOC loans, and that her dismissal was therefore a pretext.

The evaluation form's inclusion of a performance goal stating that Camp should "cross-sell HELOC loans to produce additional revenue to the bank bottom line" is similarly unilluminating; Dotson's order did not forbid Camp from cross-selling HELOC loans, but rather prohibited her from accessing Mark IV and closing the loans herself.[12]

---

[11]    Centrue submits that Camp has not shown that Dotson read Camp's comment because Dotson's normal practice was to review Sabol's evaluations of his supervisees before Sabol met with the employee being evaluated, and Camp's comment may have been added after Sabol met with Camp to discuss her evaluation.  Camp's comment, however, is typewritten in the same format as Sabol's comments and there are handwritten signatures at the bottom of the form, suggesting to the court that the evaluation included Camp's comments when it was passed along to Dotson for his review.  When viewed in the light most favorable to Camp, then, Dotson reviewed this comment.

[12]    While Camp denies Centrue's assertion that Camp was to "refer any customer needing a HELOC to a branch manager or personal banker who could write such a loan," Defs.' Stmt. of Facts No. 18, she does so by relying on her own testimony that she continued to write HELOC loans while she was a mortgage loan originator and that Dan Sabol knew that she did so.  *See* Plt.'s Resp. to Def's Stmt. of Facts No. 18.  But Camp admits that her access to Mark IV, the only system through which HELOC loans may be written at Centrue, should have been terminated by Centrue when she became an MLO, a strong indication that as a general matter cross-selling does not mean the same thing as writing the loan.  *See Id*. at 23.

Moreover, Dotson's admission that his order to Camp not to use Mark IV did not constitute a formal warning under Centrue's disciplinary procedures is also of no help to Camp, as she has not contended that her termination was a violation of Centrue's internal procedures and she admits that she understood Dotson's injunction and violated it. Indeed, Dotson testified that Hammitt told him that "[s]he felt very strongly that there were grounds to terminate" Camp based on Camp's disobedience. See Dotson Dep. 127 lns. 4-6.

Sabol's belief that Camp was penalized harshly by Dotson, *see* Plt.'s Stmt. Facts No. 32, and that Camp was "extraordinarily helpful" and would be "an asset to any organization," Resp. Ex. 4, reflects Sabol's personal opinion; it is not evidence that Dotson's dismissal of Camp was pretextual when viewed in light of Camp's admitted disobedience and her failure to put forth evidence that such insubordination did not constitute good cause for her dismissal.

Along with the weak evidence of suspicious timing, described above, there is evidence that Sabol, Camp's immediate supervisor, approved of her use of Mark IV after her January 9, 2008 review, two months after Dotson ordered Camp not to use it. Indeed, Camp testified that Sabol told her to "go ahead and use [Mark IV] until it's gone. Defs.' Stmt. Facts, Ex. A, Camp Dep. 72, lns. 9-16. Sabol admitted as much, stating at his deposition that he told Donna that he did not see a problem with her using Mark IV, without writing home equity loans, "as long as you have access to it." Sabol Dep. 24, lns. 9-12. Camp also testified that after Dotson told her "no more Mark IV, you're done" in November 2007, she spoke to Sabol about Dotson's order and he said "do you still have

Mark IV, I [Camp] said yes. [Sabol] said don't worry about it . . . he would try to talk to Roger about this." Camp Dep. 63, lns. 12-16.

This evidence shows that Sabol condoned Camp's continued use of Mark IV, and his reaction to the news of her termination shows that he thought Dotson was being harsh and perhaps unreasonable. But such evidence cannot show that her discharge was a pretext for retaliation with no evidence that Dotson shared Sabol's views or ever reconsidered his injunction to Camp to stop using Mark IV. At best, Sabol's actions are evidence that he abetted or approved of Camp's violation of Dotson's directive. They do not show that Dotson's discharge of Camp based on her refusal to follow his orders was a pretext for FMLA retaliation. Camp admits that she knew that Dotson was Sabol's supervisor, and she has offered no evidence that she believed that Sabol could or did override Dotson's explicit prohibition.

In sum, Camp has failed to adduce sufficient evidence to create a genuine dispute that her discharge was pretextual.

## B. Directed Method: Final Assessment

In sum, Camp cannot prevail under the direct method because she has put forth meager evidence of suspicious timing. Timing alone can rarely defeat summary judgment and this is not one of the exceptional circumstances where it will. *See Andonissamy*, 547 F.3d at 851. The sequence of events here (Camp's termination the day after she submitted her request for FMLA leave), coupled with Sabol's shock at the severity of the punishment for Camp's violation has caused the court to look closely at the evidence of causation, but it is not enough to create a genuine issue of material fact. Centrue has put forth strong evidence that Camp was discharged for a legitimate business

reason (or at least a business reason in which Dotson sincerely believed) as well as unrebutted evidence that Dotson did not learn of Camp's FMLA request until after he had decided to discharge her for her insubordination. Accordingly, the court finds that there is no genuine issue of material fact regarding the causal link between Camp's FMLA request and her discharge under the direct method.

## C. Indirect Method

To make out a *prima facie* case of retaliation under the indirect method, Camp must show, *inter alia*, that she was treated less favorably than similarly situated individuals who did not engage in protected conduct. *See Argyropoulos*, 539 F.3d at 733. As discussed in section III.A.2 above, Camp has set out no competent evidence of similarly situated individuals and has therefore failed to make out her prima facie case under the indirect method.

As Camp has not put forth sufficient evidence to create a triable issue of fact as to the causal connection between her discharge and her FMLA request under either the direct or indirect method of proof, Centrue's motion for summary judgment is granted.

## D. Centrue Financial's Motion for Summary Judgment

Centrue Financial has moved for summary judgment arguing that Centrue Financial is a holding company that was never Camp's employer within the meaning of the FMLA. *See* FMLA, 29 U.S.C. § 2611(4)(A)(i); U.S. Department of Labor Implementing Regulations, 29C.F.R. § 825.104(c). In response, Camp has conceded that she can offer no facts to challenge Centrue Financial's assertions. Accordingly, Centrue Financial is not an employer within the meaning of the FMLA and its motion for summary judgment is granted.

**E.  Camp's Motion for Leave to File the Third Amended Complaint**

Camp has requested leave to file her third amended complaint to add an FMLA interference claim.  Defendants object, arguing that Camp moved for leave after the time for amendment had closed pursuant to the court's discovery order, and after Defendants had already filed their motions for summary judgment.  Defendants also complain that plaintiff seeks to reopen discovery and that amendment would be futile.

The court may grant a plaintiff leave to file an amended complaint when justice so requires.  *See* Fed. R. Civ. P. 15(a)(2).  It may also grant leave to amend on a contingent basis.  *See, e.g.*, *S.F.M. Corp. v. Sundstrand Corp.*, 99 F.R.D. 101, 107 (N.D. Ill. 1983).  While the court understands that Defendants are inconvenienced by the timing of the request for leave, the court finds that granting leave would not prejudice Defendants, particularly because Camp reaffirmed in reply that she does not require more discovery.  The court will grant Camp leave to amend contingent on that representation.

Moreover, the court finds that Camp's motion would not be futile, as the futility analysis turns on Camp's inability to state a claim, not her likelihood of success on the merits.  *See Bower v. Jones*, 978 F.2d 1004, 1008 (7th Cir. 1992) ("[A]n amendment may be futile when it fails to state a valid theory of liability or could not withstand a motion to dismiss.").  Though the court appreciates that it is not obvious how Camp can prevail on the merits of her interference claim given the findings in this order, the court has found that Dotson knew of Camp's FMLA request prior to actually terminating Camp's employment, and Defendants have cited no binding precedent holding that a plaintiff cannot prevail on that basis.  While *Saterlee v. Allen Press, Inc.*, 274 Fed. Appx. 642 (10th Cir. 2008), presents a very similar set of facts (the decisionmaker was informed of

the FMLA leave the day after she decided to dismiss the plaintiff for cause), it is only persuasive authority, and the court will not deny Camp so basic an entitlement as leave to amend on the basis of one case and such meager briefing.

### CONCLUSION

Defendants' motions for summary judgment are granted. Camp's "Motion for Leave to File Third Amended Complaint" is granted.


ENTER:


_____/s/_____
JOAN B. GOTTSCHALL
United States District Judge

DATED: March 31, 2010