UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

DONNA CAMP,           )
        Plaintiff,  )
                         )   Case No. 08 C 4020
     v.           )
                         )   Judge Joan B. Gottschall
CENTRUE BANK,         )
        Defendant.  )

**MEMORANDUM OPINION & ORDER**

Defendant Centrue Bank ("Centrue") moves for summary judgment against Plaintiff Donna Camp ("Camp") on her third amended complaint. For the reasons set forth below, the motion is granted.

### I. BACKGROUND

Having previously provided a lengthy description of the facts in this case, the court will only briefly summarize certain undisputed facts here. *See Camp v. Centrue Fin. Corp.*, No. 08 C 4020, 2010 WL 1333811 (N.D. Ill. Mar. 31, 2010). At some point in 2006, Camp began working as a Mortgage Loan Originator ("MLO") for Centrue Bank at Centrue's Yorkville, Illinois branch. In that role, Camp's direct supervisor was Dan Sabol, who was himself supervised by Executive Vice President Roger Dotson. As an MLO, Camp's duties included, *inter alia*, obtaining business from realtors, building a customer base, and working with existing customers. MLOs do not, however, have lending authority or underwriting responsibility. Centrue employees who are permitted originate, approve, and close home equity lines of credit ("HELOCs") do so through a computerized loan scoring and lending program called Mark IV. Thus, when Camp (who

previously had acted as a personal banking supervisor) became an MLO, Centrue should have eliminated Camp's access to Mark IV, but that did not happen.

However, Dotson specifically told Camp at a November 16, 2007 meeting that she was not to use Mark IV. Dotson believed that allowing MLOs to access Mark IV (which allows the same person to input, review, and close a qualified loan) created a potential security or fraud problem, and could have caused Centrue to be noncompliant with the Sarbanes-Oxley Act. During that meeting, Camp argued with Dotson, but later apologized and confirmed that she would focus only on mortgages from that point forward.

Camp continued to use Mark IV unbeknownst to Dotson. During a February 20, 2008 review, he noticed that Camp's name was listed in a Mark IV access log; further investigation indicated that Camp had logged onto Mark IV at least ten times and that she had used other people's names to do so. Dotson decided to discharge Camp, and spoke with various Centrue executive board members, as well as with Heather Hammitt (the Director of Human Resources), regarding his decision. On February 25, 2008, Dotson advised Sabol, Camp's supervisor, that he planned to fire her. Sabol asked him to reconsider, but Dotson declined to do so. On February 26, 2008, Dotson drove to the Yorkville facility and terminated Camp's employment.

At some point during this process, Dotson personally learned that Camp had requested leave under the Family Medical Leave Act ("FMLA") so that she could be treated for cancer. Camp had first contacted one of Centrue's benefit specialists, Donna Mussatto, regarding FMLA leave on or about February 8, 2008. Mussatto received Camp's FMLA request via email on February 25, 2008 and confirmed Camp's FMLA

eligibility that same day. Camp was notified that her FMLA request had been approved the day after her employment was terminated by Dotson.

Camp filed suit in state court. The action was removed, and this court permitted Camp to amend her complaint twice. In her second amended complaint, she alleged, *inter alia*, wrongful termination and retaliation in violation of the FMLA.[1] Centrue filed a motion for summary judgment. While the briefing on the summary judgment motion was underway, Camp sought leave to amend her complaint a third time to assert an FMLA interference claim. The court granted summary judgment on the second amended complaint, but also granted Camp leave to amend. In so doing, the court warned that "it is not obvious how Camp can prevail on the merits of her interference claim given the findings in this order." Centrue has now moved for summary judgment on the third amended complaint, which the court addresses below.

## II. DISCUSSION

**A.     Standard of Review**

Summary judgment is warranted where "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). On summary judgment, all facts and any inferences to be drawn therefrom must be viewed in the light most favorable to the non-moving party. *McCann v. Iroquois Mem'l Hosp.*, 622 F.3d 745, 752 (7th Cir. 2010). Of course, the court is not required to make every conceivable inference in the non-movant's favor; instead, only *reasonable* inferences must be drawn. *Smith v. Hope Sch.*, 560 F.3d 694, 699 (7th Cir. 2009). Further, the non-moving party cannot "merely allege the existence of a factual dispute to

---

[1]     The court had granted Centrue's motion to dismiss the other counts on May 29, 2009. (*See* Order, ECF No. 45.)

3

defeat summary judgment." *McPhaul v. Bd. of Comm'rs*, 226 F.3d 558, 563 (7th Cir. 2000). The non-movant must provide sufficient evidence so as to "allow a jury to render a verdict in her favor." *Id.* If a plaintiff fails to establish one of the elements of her case and there is no factual dispute regarding that element, then summary judgment will be entered in favor of the defendant. *See Beard v. Banks*, 548 U.S. 521, 529-30 (2006); *Johnson v. ExxonMobil Corp.*, 426 F.3d 887, 892 (7th Cir. 2005).

**B.     Analysis**

    1.     Previously Admitted Facts

As a preliminary matter, Centrue urges the court to treat as admitted all of the facts the court previously deemed admitted when it granted summary judgment on Camp's second amended complaint. Certain of those facts were (and are) admitted by Camp; others the court decided to treat as admitted due to Camp's failure to comply with Local Rule 56.1(b)(3)(B) and other governing principles. *See Camp*, 2010 WL 1333811, at *1 n.1.[2] Camp, in turn, argues that justice requires the court to consider the full substance of her pleadings and urges the court not to rely on a "technicality."

Neither party cites any on-point authority in support of its position, although the court identified decisions going both ways. *Compare, e.g.*, *Real Colors, Inc. v. Patel*, 39 F. Supp. 2d 978, 986 (N.D. Ill. 1999) ("Obviously, [the plaintiff], for the purposes of its earlier motion for summary judgment, failed to appreciate the importance of Local Rule compliance. Although it might have been fatal to that motion, it is not necessarily fatal for subsequent motions.") *with Fisher v. Ill. Dep't of Corr.*, 51 F. Supp. 2d 883, 884-

---

[2]   Of the eighteen facts that the court previously deemed admitted, Camp takes issue with six: 39, 45, 46, 53, 56, and 58. These correspond to numbered paragraphs 44, 50, 51, 59, 62, and 64 from Defendants' Combined Statement of Material Facts in the earlier motion for summary judgment.

85 (N.D. Ill. 1999) ("Time and again, the judges of this Court have strictly enforced our Local Rules . . . which deem admitted all of the facts set forth in the plaintiff's statement of additional facts which are not properly controverted by the other party's response. We do so again today. Not only will these facts will be deemed admitted for purposes of this motion, but they will continue to be so considered for the duration of the case, including the trial."). But the court need not decide this issue, because Camp's "new" responses do not help her in any event.

2. FMLA Interference

Under the FMLA, an eligible employee is entitled to take up to twelve weeks of leave per year due to "a serious health condition that makes the employee unable to perform the functions of the position of such employee." 29 U.S.C. § 2612(a)(1)(D). The Act forbids any employer from "interfere[ing] with, restrain[ing], or deny[ing] the exercise of or the attempt to exercise, any right provided under [the Act]." *Id.* § 2615(a)(1).

To prevail on a claim for FMLA interference, Camp ultimately would have to establish that: (1) she was eligible for FMLA protections; (2) her employer was covered by the FMLA; (3) she was entitled to leave under the FMLA; (4) she provided sufficient notice of her intent to take FMLA leave; and (5) her employer denied her FMLA benefits to which she was entitled. *See Righi v. SMC Corp.*, 632 F.3d 404, 408 (7th Cir. 2011).

There appears to be no argument that had Camp not been discharged, she would have been eligible for FMLA protections; that Centrue was covered by the FMLA; that Camp would otherwise have been entitled to FMLA leave; and that she provided

sufficient notice of her intent to do so. Therefore, the argument revolves solely around whether Centrue denied Camp benefits to which she was entitled by discharging her.

Although the court permitted Camp to amend her complaint to allege a new cause of action under the FMLA, Camp's responses to Centrue's motion for summary judgment are nearly identical in substance to those Camp filed in response to Centrue's previous motion.[3] Camp attempts to ward off summary judgment by asking the court to draw two inferences in her favor: first, that Camp was not insubordinate or that her alleged insubordination was not the reason for her termination; and second, that Dotson knew of Camp's FMLA request before setting out for Yorkville to terminate her on February 26, 2008. But the logical leaps that Camp asks the court to make are not supported by the evidence; instead, as before, the only evidence supports the opposite conclusion.

a) <u>Insubordination</u>

Camp argues that she was not insubordinate or that, at least, her insubordination was not the reason for her termination. In support, she points to (1) her performance reviews, which were generally good and did not contain admonishments regarding her use of Mark IV; (2) the fact that she was not issued a verbal or written warning after her November 2007 argument with Dotson; (3) the lack of written procedures or policies that were violated by Camp's Mark IV use; (4) the fact that Camp was told to "[c]ross sell HELOCs" and that Sabol had made it clear that HELOCs could only be written with

---

[3] Indeed, although Camp has abandoned some lines of argument, the inferential steps she asks the court to take here are identical to certain of those already rejected. The court will not repeat verbatim reasoning that applies with equal force to Camp's present response. Although the court will summarize the reasons for its decision, the court also expressly adopts the discussions from its prior order granting summary judgment; specifically, the reasoning set forth in Section (A)(1) regarding suspicious timing and Section (A)(3) regarding pretext are hereby incorporated by reference. *See Camp*, 2010 WL 1333811, at **3-10.

Mark IV; (5) the fact that Sabol had told Camp not to be concerned about the November 2007 confrontation and made some statements regarding Camp's continued use of Mark IV; and (6) the fact that Sabol was very surprised when Camp was fired and thought her to be a valuable employee.

The court has already gone into great detail as to why these facts do not suffice to create a genuine issue for trial. *See Camp*, 2010 WL 1333811, at **7-10. First, Camp's general performance is not very probative. Camp knew that she was not to use Mark IV, but did so anyhow. More importantly, Dotson was the undisputed decisionmaker, and Camp cites no evidence showing that her insubordination was not viewed by Dotson as constituting good cause for her dismissal. As this court stated, "[i]t was Dotson's responsibility to locate potential problems with fraud in order to certify Centrue's Sarbanes-Oxley compliance and he believed Camp's access created a problem for Centrue. Whether Dotson was ultimately correct in this assessment does not undo Camp's breach of Dotson's command, and Camp provides no basis from which the court or a reasonable jury could determine that it would. Moreover, Camp has adduced no competent evidence to show that Dotson's belief was unfounded or not sincerely held."

For the reasons previously stated in *Camp*, 2010 WL 1333811, at **8-9, Sabol's opinions and actions are immaterial here. Nor do Camp's actions (*e.g.*, seeking credit for HELOCs closed in 2007) provide any support for her claims. Camp has not pointed to any facts that create a genuine dispute regarding her insubordination.

b) <u>Knowledge of FLMA Request</u>

Here, the relevant question is whether Dotson—the undisputed decisionmaker—learned of Camp's FMLA leave request before deciding to terminate her employment.

7

*See Long v. Teachers' Retirement Sys.*, 585 F.3d 344, 351 (7th Cir. 2009) (in retaliation context, where the record showed that the supervisor did not know that the plaintiff took FMLA leave, the supervisor "could not have possibly terminated her for that reason").

The court will not belabor the point. As the court found previously, undisputed evidence establishes that Camp's termination was the final event in a decisionmaking process that Dotson put into motion as soon as he discovered, on February 20, 2008, that Camp accessed Mark IV multiple times in violation of his November 2007 order. This process included investigating Dotson's findings; discussing the issue with Sabol, Centrue President/CEO Tom Daiber, Hammitt, and the executive committee; submitting a disciplinary action form for Hammitt's review; and setting up an meeting with Camp in Yorkville.

Camp asks the court to infer that Dotson knew about her FLMA request prior to deciding to discharge her. In support, she points to the fact that: (1) Donna Mussatto and Dan Sabol knew of Camp's intent to request leave prior to Camp's submission of a formal request; (2) Mussatto told Heather Hammitt about the FMLA request at some point; (3) while nothing indicates precisely when Hammitt told Dotson about the request, Dotson and Hammitt had numerous conversations about Camp's improper Mark IV access; (4) during their February 26, 2008 conversation, Hammitt asked Dotson whether Dotson's decision to fire Camp could create any "exposure for the bank," implying knowledge of some vulnerability on Centrue's part; and (5) when Sabol mentioned to Dotson that Camp was receiving chemotherapy, Dotson responded "I don't really care," which could imply that Dotson already knew about the illness or the FMLA request.

These are the same inferences the court was asked to draw previously, and they fail for the same reasons. *See Camp*, 2010 WL 1333811, at **3-6. Camp claims that Hammitt's question regarding exposure "implies knowledge of facts from which 'exposure' could potentially arise." But the next few lines of Dotson's testimony continue: "then [Hammitt] told me, well . . . I [Hammitt] just found out [Camp] applied for an FMLA leave . . . would that change your mind?" Thus, while it is not clear what Hammitt meant by "exposure," Dotson's unrebutted testimony establishes that during the February 26, 2008 phone call, Hammitt told Dotson that she had just learned of Camp's FMLA request, and that Dotson did not know about Camp's request until that time. In other words, Hammitt's mention of "exposure" cannot support an inference that Dotson knew of Camp's FMLA request before Hammitt had even informed him of it. In addition, this unrebutted evidence precludes the court from drawing the inference that during prior discussions between Hammitt and Dotson regarding Camp's Mark IV violations, the FMLA request might also have been discussed.

Likewise, the notion that any supporting inference could be drawn from Dotson's "dismissive response" to Sabol's statement regarding Camp's chemotherapy appointment is untenable. Camp states that "[a]ccording to Sabol, Dotson's response was simply, 'I don't really care.'" In fact, that portion of the discussion occurred when Sabol was asking Dotson if Dotson was already on his way to meet with, and to fire, Camp. Sabol recounted that Dotson responded "I don't really care where she is at. I am going up there. She is going to be fired." As the court found previously, at best Dotson's statement reflects a fixed determination to discharge Camp; Camp points to no evidence to support a different interpretation of Dotson's words. Camp's theory as to the intent

9

behind Dotson's remark is entirely speculative and is insufficient to satisfy her burden in opposing summary judgment in light of Dotson's unrebutted testimony to the contrary. Camp's general allegations of "suspicious timing," without more, likewise do not create a genuine issue of material fact.

### III. CONCLUSION

Camp has not shown that there are any material facts in dispute that preclude summary judgment. For the reasons set forth above, the court grants summary judgment in favor of Centrue. The case is dismissed with prejudice.

ENTER:

/s/
JOAN B. GOTTSCHALL
United States District Judge

DATED: May 31, 2011